# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 10
Jesus Ferreira,
     Appellant,
   v.
City of Binghamton et al.,
     Respondents.

Robert Genis, for appellant.
Brian S. Sokoloff, for respondents.
New York Civil Liberties Union; New York State Academy of Trial Lawyers; New York State Conference of Mayors and Municipal Officials et al.; New York City Bar Association; New York County Lawyers Association et al.; City of New York; New York State Trial Lawyers Association, amici curiae.

SINGAS, J.:

The United States Court of Appeals for the Second Circuit has inquired whether New York's " 'special duty' requirement" applies "to claims of injury inflicted through municipal negligence" or if it applies only to claims premised upon a municipality's

negligent "failure to protect the plaintiff from an injury inflicted other than by a municipal employee" (975 F3d 255, 291 [2d Cir 2020]).  Consistent with our precedent and the purpose of the special duty rule, we reiterate that plaintiffs must establish that a municipality owed them a special duty when they assert a negligence claim based on actions taken by a municipality acting in a governmental capacity.  We further clarify that plaintiffs may establish a special duty when a municipality, acting through its police force, plans and executes a no-knock search warrant at a person's home, and that such a duty runs to the individuals within the targeted premises at the time the warrant is executed.

## I.

In August 2011, a police officer employed by defendant Binghamton Police Department obtained information that Michael Pride, an alleged armed and dangerous felony suspect, resided at a certain apartment in that city.  On August 24, 2011, the police obtained a no-knock search warrant for the residence.[1]  That night, police officers surveilled the residence for approximately one hour, confirming Pride's connection with the apartment identified in the warrant.  The officers observed Pride and another man in front of the residence engage in activity consistent with a drug transaction.  Later, they saw

---

[1] Police may obtain authorization "to enter premises to be searched without giving notice of [their] authority and purpose"—i.e., a no-knock warrant—upon a showing of "reasonable cause to believe" that evidence may be destroyed, notice may endanger the life or safety of the police or other person, or where the subject of a felony warrant is likely to commit another felony or endanger the safety of others (CPL 690.35 [4] [b]).

Pride leave the residence. The police never saw Pride return to the apartment, and they did not conduct additional surveillance.

Because the police believed that Pride was dangerous, a heavily-armed SWAT team conducted a dynamic entry into the residence early the next morning to execute the search warrant. A dynamic entry uses speed and surprise to gain an advantage before occupants have time to access weapons, destroy evidence, or resist the police. The team had difficulty entering and had to strike the door repeatedly before it opened. After breaching the door, defendant Police Officer Kevin Miller led the SWAT team into the apartment. Upon entry, Miller encountered plaintiff, who had slept on the living room couch near the front door. Plaintiff and Miller gave different accounts of what happened next, but it is undisputed that Miller shot plaintiff, who was unarmed, in the stomach and that plaintiff suffered serious injuries. Miller claimed that plaintiff advanced towards him, and he mistook an Xbox controller in plaintiff's hand for a handgun. Plaintiff maintained that he did not leave the couch, did not have the controller in his hand, and Miller shot him as soon as the door opened.

Plaintiff commenced this action in federal court against, among others, Miller, the police department, and the City of Binghamton (the City). As relevant here, plaintiff asserted a state law negligence claim, contending that the City breached a special duty.[2] At trial, plaintiff alleged that the City was liable under a respondeat superior theory for

---

[2] Plaintiff also interposed state law causes of action sounding in false arrest and battery, as well as a federal excessive force claim under 42 USC § 1983.

Miller's negligence in shooting plaintiff and for the police department's negligence in planning the raid.

The jury found that Miller had not acted negligently and rendered a verdict in his favor. However, the jury determined that the City was "liable for negligence with respect to the incident . . . under a respondeat superior theory" and awarded plaintiff $3 million in damages, with 90% apportioned to the City.

Both plaintiff and the City moved for judgment as a matter of law or, alternatively, a new trial. Plaintiff contended that the jury's verdict as to Miller's liability and negligence was against the weight of the evidence and should be set aside. The City argued, among other things, that there was no evidence establishing that it owed a special duty to plaintiff and, in any event, its liability was precluded by the governmental function immunity defense.

As relevant here, the United States District Court for the Northern District of New York denied plaintiff's motion and granted the City's motion for judgment as a matter of law. In denying plaintiff's motion, the court determined that a reasonable jury could have concluded that Miller's "mistake and the shooting that resulted" did not violate any applicable standard of care and hinged on a credibility determination best left for the jury (US Dist Ct, ND NY, 3:13 CV 107, Sept. 27, 2017, McAvoy, Sr. J.). Concerning the City's motion, the court concluded that New York law required that plaintiff demonstrate that the City owed him a special duty and no record evidence supported a special duty here. The

court noted that, in any event, the governmental function immunity defense would bar plaintiff's claim against the City.

Upon plaintiff's appeal, the Second Circuit upheld the portion of the district court order denying plaintiff's motion, explaining that "the jury could reasonably conclude that Miller was not negligent in believing himself threatened and shooting" plaintiff (975 F3d at 268). The issue of whether Miller was negligent in shooting plaintiff was therefore resolved in the federal courts and is not before us.

The Second Circuit next addressed the district court's grant of judgment as a matter of law to the City. The court first determined that the governmental function immunity defense did not protect the City from liability because plaintiff had "elicited sufficient evidence to support a jury finding that the City, through the actions of its employees in the police department and SWAT unit, violated established police procedures and acceptable police practice" by "failing to conduct adequate pre-raid surveillance of the residence or gather other intelligence" (*id.* at 272).[3]

The court then turned to plaintiff's argument that "the special duty requirement applies only in cases in which the allegedly negligent government conduct is the failure to protect from or respond adequately to a separately imposed injury, but does not apply

---

[3] The Second Circuit did not certify a question concerning governmental function immunity and, thus, we have no occasion to address the Second Circuit's analysis of that issue here, despite the City's request that we do so (*see* 975 F3d at 271 [noting that the governmental function immunity issue on the appeal raised "two related but distinct legal questions, which the New York Court of Appeals has apparently not explicitly addressed"]).

where the negligent conduct alleged involves the municipal government's own infliction of injury" (*id.* at 282). According to the Second Circuit, New York law offered "conflicting guidance" on the issue, making it "impossible to discern" whether plaintiff was required to establish a special duty (*id.*). The Second Circuit therefore certified a question to this Court:

> "Does the 'special duty' requirement—that, to sustain liability in negligence against a municipality, the plaintiff must show that the duty breached is greater than that owed to the public generally—apply to claims of injury inflicted through municipal negligence, or does it apply only when the municipality's negligence lies in its failure to protect the plaintiff from an injury inflicted other than by a municipal employee?" (*Id.* at 291).

We accepted the question (*see* 35 NY3d 1105 [2020]).

## II.

New York waived its immunity from liability in 1929 when it enacted Court of Claims Act former § 12-a, now § 8 (*see Bernardine v City of New York*, 294 NY 361, 365 [1945]). The State's immunity waiver applies equally to its municipal subdivisions, including cities (*see Valdez v City of New York*, 18 NY3d 69, 75 [2011]; *Florence v Goldberg*, 44 NY2d 189, 195 [1978]). By this waiver, "the State assumed liability for its conduct and consented to have such liability determined in accordance with the same rules of law applicable to individuals and corporations," thereby opening the door to negligence claims against municipal actors (*Florence*, 44 NY2d at 194-195). Nevertheless, "other recognized limitations still govern the tort liability of municipal officers" (*Tango v*

*Tulevech*, 61 NY2d 34, 40 [1983]), and governmental defendants "unquestionably continue to enjoy . . . a significant measure of immunity" (*Haddock v City of New York*, 75 NY2d 478, 484 [1990]; *see Connolly v Long Is. Power Auth.*, 30 NY3d 719, 726-727 [2018]).

In any common-law negligence case brought pursuant to New York law, "a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom" (*Solomon v City of New York*, 66 NY2d 1026, 1027 [1985]). Thus, a threshold issue that the court must resolve "is whether the defendant owed a legally recognized duty to the plaintiff" (*Gilson v Metropolitan Opera*, 5 NY3d 574, 576 [2005]; *see Lauer v City of New York*, 95 NY2d 95, 100 [2000]). A negligence claim against a municipality implicates a "complex area of the law" that has caused some "confusion concerning the relationship between the special duty rule (establishing a tort duty of care) and the governmental function immunity defense (affording a full defense for discretionary acts, even when all elements of the negligence claim have been established)" (*Valdez*, 18 NY3d at 77-78). This Court has therefore adhered to a conceptual framework to analyze the special duty and governmental function immunity doctrines when both issues are presented in a given case.

As we have explained previously, a court must first decide "whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose" (*Applewhite v Accuhealth, Inc.*, 21 NY3d 420, 425 [2013]; *see Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs.*, 28 NY3d 709, 713 [2017]). "This is so because, if the action challenged in the litigation is governmental, the existence of a special

duty is an element of the plaintiff's negligence cause of action" (*Connolly*, 30 NY3d at 727, citing *Lauer*, 95 NY2d 95). A municipality's "varied functions" may be "interspersed with both governmental and proprietary elements" and, therefore, "the determination of the primary capacity under which a governmental agency was acting turns solely on the acts or omissions claimed to have caused the injury" (*Matter of World Trade Ctr. Bombing Litig.*, 17 NY3d 428, 447 [2011], *cert denied* 568 US 817 [2012]).

"A government entity performs a purely proprietary role when its activities essentially substitute for or supplement traditionally private enterprises" (*Applewhite*, 21 NY3d at 425 [internal quotation marks and citation omitted]), such as when a government entity acts as a landlord (*see Miller v State of New York*, 62 NY2d 506, 511 [1984]). Conversely, "a municipality will be deemed to have been engaged in a governmental function when its acts are undertaken for the protection and safety of the public pursuant to the general police powers" (*Applewhite*, 21 NY3d at 425 [internal quotation marks and citation omitted]). Examples of governmental functions include fire protection services, the oversight of juvenile delinquents, the issuance of building permits or certificates of occupancy, garbage collection, and the provision of front-line emergency medical services (*see id.* at 425-426, 430). As particularly relevant here, policing is a "long-recognized, quintessential governmental function[ ]" (*id.* at 425; *see Valdez*, 18 NY3d at 75), and there is no dispute that the specific act alleged to have caused the injury here—the planning and execution of a no-knock warrant—is a governmental function.

We have also explained previously that "[i]f the municipality's actions fall in the proprietary realm, it is subject to suit under the ordinary rules of negligence applicable to nongovernmental parties" (*Applewhite*, 21 NY3d at 425; *see Tara N.P.*, 28 NY3d at 713). In that instance, "the State is held to the same duty of care as private individuals and institutions engaging in the same activity," consistent with the State's sovereign immunity waiver (*Schrempf v State of New York*, 66 NY2d 289, 294 [1985]). However, where a municipality is exercising a governmental function—i.e., undertaking functions or services that are not typically provided by private actors—the duty question is more complicated, with "the next inquiry focus[ing] on the extent to which the municipality owed a 'special duty' to the injured party" (*Applewhite*, 21 NY3d at 426; *see Tara N.P.*, 28 NY3d at 714).[4]

Under the public duty rule, a municipality owes a general duty to the public, but it does not owe "a duty of care running to a specific individual sufficient to support a negligence claim, unless the facts demonstrate that a special duty was created" (*Valdez*, 18 NY3d at 75; *see Florence*, 44 NY2d at 195-196). The special duty doctrine thus developed "to rationally limit the class of citizens to whom the municipality owes a duty of protection" (*Kircher v City of Jamestown*, 74 NY2d 251, 258 [1989]). "The core principle is that to

---

[4] The dissent ignores this black letter law, erroneously suggesting that whether a municipality is engaged in a governmental or proprietary function has no bearing on an assessment of negligence (*see* dissenting op at 2, 11). Our cases plainly demonstrate the significance of the proprietary/governmental function distinction to the special duty analysis, with only proprietary functions subject to an "ordinary" duty of care (*see e.g. Wittorf v City of New York*, 23 NY3d 473, 479-480 [2014] [highway planning, design, and maintenance are proprietary functions]; *Schrempf*, 66 NY2d at 294 [certain medical and psychiatric care are proprietary functions]).

'sustain liability against a municipality [engaged in a governmental function], the duty breached must be more than that owed the public generally' " (*Applewhite*, 21 NY3d at 426, quoting *Valdez*, 18 NY3d at 75; *see Lauer*, 95 NY2d at 100). To that end, we have "consistently refused to impose liability for a municipality in performing a public function absent a duty to use due care for the benefit of particular persons or classes of persons" (*Lauer*, 95 NY2d at 101 [internal quotation marks and citation omitted]). That is not to say that a negligence claim may never lie against a municipal defendant for acts undertaken in its governmental capacity. Rather, this Court has recognized that a special duty exists in "a narrow class of cases" where the plaintiff establishes a duty on the part of the municipal defendant running to the plaintiff (*Cuffy v City of New York*, 69 NY2d 255, 260 [1987]; *see Sorichetti v City of New York*, 65 NY2d 461, 468 [1985] [a special duty arises in "extraordinary instances"]).

More specifically, this Court has

> "recognized that a special duty can arise in three situations: (1) the plaintiff belonged to a class for whose benefit a statute was enacted; (2) the government entity voluntarily assumed a duty to the plaintiff beyond what was owed to the public generally; or (3) the municipality took positive control of a known and dangerous safety condition" (*Applewhite*, 21 NY3d at 426).

Where the claimed negligent acts or omissions involved a governmental function, "[i]t is the plaintiff's obligation to prove that the government defendant owed a special duty of care to the injured party because duty is an essential element of the negligence claim itself" (*id.*). "In situations where the plaintiff fails to meet this burden, the analysis ends and

liability may not be imputed to the municipality that acted in a governmental capacity" (*id.*;
*see Tara N.P.*, 28 NY3d at 714).  Thus, where there is no special duty "courts will not
examine the 'reasonableness' of the municipality's actions" (*Sorichetti*, 65 NY2d at 468).[5]

"Even if a plaintiff satisfies" their burden of demonstrating that a special duty exists,
"a municipality acting in a discretionary governmental capacity may rely on the
'governmental function immunity defense,' " an affirmative defense that must be pleaded
and proven by the municipality (*Turturro v City of New York*, 28 NY3d 469, 478 [2016],
quoting *Valdez*, 18 NY3d at 75).  "The doctrine of governmental function immunity
'reflects separation of powers principles and is intended to ensure that public servants are
free to exercise their decision-making authority without interference from the courts' "
(*Connolly*, 30 NY3d at 727, quoting *Valdez*, 18 NY3d at 76).  The doctrine represents

> "a value judgment that—despite injury to a member of the
> public—the broader interest in having government officers and
> employees free to exercise judgment and discretion in their
> official functions, unhampered by fear of second-guessing and
> retaliatory lawsuits, outweighs the benefits to be had from
> imposing liability for that injury" (*Haddock*, 75 NY2d at 484;
> *see Valdez*, 18 NY3d at 76).

The governmental function immunity defense "provides immunity for the exercise
of discretionary authority during the performance of a governmental function" (*Turturro*,
28 NY3d at 479).  Thus, "even if a plaintiff establishes all elements of a negligence claim,

---

[5] On the other hand, because the special duty rule and the governmental function immunity
defense operate independently of each other, in appropriate circumstances, a court may
conclude that the municipality is not liable for its alleged negligence under the
governmental function immunity defense, without first addressing special duty.

a state or municipal defendant engaging in a governmental function can avoid liability if it timely raises the defense and proves that the alleged negligent act or omission involved the exercise of discretionary authority" (*Valdez*, 18 NY3d at 76; *see Haddock*, 75 NY2d at 484). The "defense cannot attach," however, "unless the municipal defendant establishes that the discretion possessed by its employees was in fact exercised in relation to the conduct on which liability is predicated" (*Valdez*, 18 NY3d at 76; *see McLean v City of New York*, 12 NY3d 194, 203 [2009]). As we have previously clarified, when both the special duty requirement and the governmental function immunity defense are asserted in a negligence case, "the rule that emerges is that '[g]overnment action, if discretionary, may not be a basis for liability, while ministerial actions may be, but only if they violate a special duty owed to the plaintiff, apart from any duty to the public in general' " (*Valdez*, 18 NY3d at 76-77, quoting *McLean*, 12 NY3d at 203). As discussed, the Second Circuit conducted its own analysis concerning governmental function immunity, and has not asked us to opine on this aspect of their ruling.

III.

Plaintiff argues that a special duty is required only in cases where the municipality allegedly fails to protect a plaintiff from or respond adequately to injury inflicted by a non-governmental third party. As a result, plaintiff argues, the special duty rule does not apply where a municipal employee inflicts the injury in question. We have never limited the requirement to establish a special duty in the manner advanced by plaintiff, and we decline to do so now. Such a rule—purporting to draw a distinction between those negligence

claims alleging injuries inflicted by municipal actors and those in which the injury is alleged to be inflicted by a nongovernmental actor—is belied by our precedent, unworkable, and contrary to the public policies upon which the special duty requirement is founded.

As discussed, where a plaintiff seeks to demonstrate a special duty, this Court has recognized three avenues to do so. The second route, showing a municipality's voluntary assumption of a duty, is the most litigated and, thus, dominates this Court's case law. This issue often arises in the context of a claim that the police failed to protect the plaintiff from injury inflicted by a third party after voluntarily assuming a duty to do so. A plaintiff must establish four elements to show a "special relationship" giving rise to a voluntarily assumed duty (*Tara N.P.*, 28 NY3d at 714):

> "(1) an assumption by the municipality, through promises or actions, of an affirmative duty to act on behalf of the party who was injured; (2) knowledge on the part of the municipality's agents that inaction could lead to harm; (3) some form of direct contact between the municipality's agents and the injured party; and (4) that party's justifiable reliance on the municipality's affirmative undertaking" (*Cuffy*, 69 NY2d at 260; *see Tara N.P.*, 28 NY3d at 714-715).

It is undisputed that the special duty rule applies where non-governmental third parties directly inflicted plaintiff's injury, including in the police protection context (*see e.g. Valdez*, 18 NY3d at 72; *Cuffy*, 69 NY2d at 258; *Sorichetti*, 65 NY2d at 468; *see also McLean*, 12 NY3d at 204 [requiring the plaintiff to establish a special duty where she

claimed that the municipality acted negligently in failing to protect an infant from injury caused by a private day care provider licensed by the municipality]).

However, we have never limited the special duty rule to instances in which it is alleged that a non-governmental third party directly inflicted the harm. Instead, we have applied the special duty rule where a party asserts a negligence claim against a municipality acting in its governmental capacity, regardless of who most immediately inflicted the injury. We reiterate the special duty rule's core principle as stated in *Lauer*: "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally" (95 NY2d at 100; *see Connolly*, 30 NY3d at 727; *Florence*, 44 NY2d at 195). In other words, "an agency of government is not liable for the negligent performance of a governmental function unless there existed 'a special duty to the injured person, in contrast to a general duty owed to the public' " (*McLean*, 12 NY3d at 199, quoting *Garrett v Holiday Inns*, 58 NY2d 253, 261 [1983]). That is, whenever "an individual seeks recovery out of the public purse" for acts taken in a governmental capacity (*Lauer*, 95 NY2d at 100), "[i]t is the plaintiff's obligation to prove that the government defendant owed a special duty of care to the injured party because duty is an essential element of the negligence claim itself" (*Applewhite*, 21 NY3d at 426). The requirement that a plaintiff establish a special duty when stating a negligence claim against a municipality acting in a governmental capacity reinforces these principles—despite the dissent's assertion that we are adopting a "novel proposition" (dissenting op at 20).

*Lauer* makes this point in no uncertain terms, directly contradicting plaintiff's attempt to limit the special duty requirement. In *Lauer*, the medical examiner, a municipal employee, erroneously determined at first that a child's death was a homicide, but later concluded that he actually died of natural causes. The medical examiner "failed to correct the autopsy report or death certificate, and failed to notify law enforcement authorities," who were investigating the child's father for the homicide (95 NY2d at 98). After the autopsy report was corrected and the police investigation ended, the father sought damages for the harm allegedly caused by the medical examiner's negligence. We dismissed the complaint, concluding that the father failed to establish that the medical examiner owed him a special duty beyond that owed to the public at large (*see id.* at 102, 105). Thus, in *Lauer*, we applied the special duty rule even though it was the acts of the municipally employed medical examiner, not a third-party, that allegedly caused the father's injury.[6]

Any suggestion that prior cases dispensed with the special duty rule when the municipality in question directly inflicted the alleged harm is incorrect. As the Second Circuit recognized, we resolved both *Johnson v City of New York* (15 NY3d 676 [2010]) and *Mon v City of New York* (78 NY2d 309 [1991]) by applying the governmental function immunity doctrine (*see* 975 F3d at 285 n 11) and, thus, it was unnecessary to address

---

[6] The dissent misreads *Lauer* to suggest that a plaintiff may establish an "ordinary duty" separate from a special duty when a municipality is "exercising a governmental function" (dissenting op at 20). While *Lauer* sets forth a general discussion of the law of duty, its holding plainly rejects the two bases proffered to establish a special duty, namely theories based on certain statutes and conduct purportedly giving rise to a voluntary assumption of a duty (*Lauer*, 95 NY2d at 101-103).

whether the plaintiff had established a special duty. Similarly, "we did not address the question of special duty in *Haddock*" (*Tara N.P.*, 28 NY3d at 716 n), where the issue was whether the municipality could "be held liable . . . for negligent retention" of the employee "or whether it [was] immune from liability" (*Haddock*, 75 NY2d at 483). We concluded that the municipality "was properly held liable for [a] child's injuries" because there was no evidence that the municipality "exercised any . . . discretion" that would have made the governmental function immunity defense applicable (*id.* at 480, 485). We likewise did not address whether the plaintiffs established a special duty in the other cases upon which plaintiff relies, as the issue was not raised (*see McCummings v New York City Tr. Auth.*, 81 NY2d 923, 925 [1993], *cert denied* 510 US 991 [1993]; *Meistinsky v City of New York*, 309 NY 998, 1000 [1956], *affg* 285 App Div 1153 [2d Dept 1955]; *Flamer v City of Yonkers*, 309 NY 114, 119 [1955]; *Wilkes v City of New York*, 308 NY 726, 728 [1954], *affg* 283 App Div 724 [2d Dept 1954]).

Cases like *Haddock*, *Johnson*, and *Mon*, which addressed only governmental function immunity, cannot reasonably be interpreted to cast aside the special duty rule. The same is true for cases like *McCummings*, *Meistinsky*, *Flamer*, and *Wilkes*, which likewise did not address special duty in any regard and were decided prior to this Court's subsequent refinement of the special duty rule in *Lauer* and *Valdez*.[7]

---

[7] Our decision does not implicitly overrule *McCummings*, *Meistinsky*, *Flamer*, and *Wilkes*. We simply have not yet examined factual circumstances similar to those cases through the lens of our contemporary understanding of the special duty doctrine.

In short, we have never affirmatively held that a plaintiff need not establish a special duty when stating a negligence cause of action against a municipality for acts occurring when the municipality was engaged in a governmental function. To do so here would depart from our precedent and require us to assume that the cases upon which plaintiff relies held, by implication, that no special duty was required in the respective factual scenarios based on what was omitted from our opinions. This we decline to do.

Other factors support our conclusion. First, plaintiff's proposed rule is unworkable as a practical matter. Duty and causation are separate elements of a negligence cause of action, but plaintiff urges us to improperly merge those elements by looking to the purported cause of the injury to determine whether the municipality owed a duty. In every instance in which a municipality is alleged to be liable for negligence—whether it be a failure to protect or respond or a situation in which the municipal actor more directly inflicted an injury—there must necessarily be a claim that the municipality caused the injury, at least in part. Given that there are often multiple causes of an injury, a rule tying the special duty pleading requirement to who caused the injury in question is untenable.

Further, as we have explained, "our precedent does not differentiate between misfeasance and nonfeasance, and such a distinction is irrelevant to the special duty analysis" (*Applewhite*, 21 NY3d at 426 n 1). In part, this is because "the line between misfeasance and nonfeasance is difficult to draw" (*Eaves Brooks Costume Co. v Y.B.H. Realty Corp.*, 76 NY2d 220, 226 [1990]). The rule advanced by plaintiff requiring a distinction between affirmatively inflicted injuries and those occasioned by a failure to

adequately respond or protect far too closely resembles the misfeasance versus nonfeasance distinction we have rejected. Adopting plaintiff's rule would produce inconsistent applications of the special duty requirement and a muddied pleading standard, leading to confusion and arbitrary outcomes.

Moreover, our conclusion that the special duty requirement applies to all negligence actions against a governmental defendant is consistent with the public policies upon which the special duty requirement is founded. Of course, the special duty rule is intended, in part, to ensure that municipalities do not become insurers for the injurious conduct of third parties (*see Valdez*, 18 NY3d at 75). More generally, however, the special duty rule is grounded in separation of powers concerns and a recognition that executive agencies, not the courts and juries, have the primary responsibility to determine the proper allocation of government resources and services (*see O'Connor v City of New York*, 58 NY2d 184, 191 [1983]). Indeed, the special duty rule minimizes a municipality's exposure to "open-ended liability of enormous proportions and with no clear outer limits," which could otherwise "discourage municipalities from undertaking activities to promote the general welfare" that may expose them to liability (*id.*; *see McLean*, 12 NY3d at 204). The special duty rule does not, and has never been understood to, "expand[ ] the circumstances in which governmental entities can be held liable in negligence" as the dissent would have it (dissenting op at 6). Rather, it is intended to allow municipalities to "allocat[e] resources where they would most benefit the public" and ensure that "the prime concern" is not "the avoidance of tort liability" but "the promotion of the public welfare" (*O'Connor*, 58 NY2d

at 191).  These concerns are no less implicated where an injury is more immediately inflicted through acts taken by a municipal defendant.

Finally, our conclusion that the special duty requirement applies to all claims against municipal actors does not obviate the State's waiver of sovereign immunity.  Instead, it simply requires the establishment of a duty, as is required for all negligence claims, while accounting for the unique considerations that are at play when the defendants are municipal actors undertaking governmental functions (*see generally Florence*, 44 NY2d at 195).

IV.

Our precedent dictates that a plaintiff must establish a special duty when suing a municipality in negligence.  However, because the underlying premise of the certified question appears to be that a special duty could not be established in a scenario like the one presented, we take this opportunity to clarify that this is not the case: a special duty may be established where the police plan and execute a no-knock search warrant on a targeted residence.[8]  Although we have not yet had an occasion to address application of the special duty rule to the execution of no-knock search warrants, that situation fits within the existing parameters of our special duty precedent.

*Smullen v City of New York* (28 NY2d 66 [1971]) is the prototypical case for the third manner of establishing a special duty, where the municipality takes positive control

---

[8] Notably, however, plaintiffs alleging injuries caused by police shootings often assert other state law tort claims, such as battery, and federal claims of excessive force, that do not require a showing of duty (*see Jones v State of New York*, 33 NY2d 275, 279 [1973]). Indeed, plaintiff asserted such claims in this litigation.

of a known and dangerous safety condition.  There, we determined that a special duty could be established where a municipal inspector on a work site informed the decedent that a trench did not need to shored just before it collapsed, killing the decedent.  We explained that the municipality had "actual knowledge of the dangerous condition," the authority to halt work on the trench, the inspector was the only person in authority then present, and the inspector took "positive action in assuming direction and control" over the dangerous situation of the inspector's own making (*id.* at 71, 72; *compare O'Connor*, 58 NY2d at 191).

Consistent with our approach in *Smullen*, when police plan and execute a no-knock search warrant, they effectively take control of the targeted premises, knowingly creating an unpredictable and potentially dangerous condition at a particular premises.  The police decide when, where, and how to execute the warrant, often proceeding with a dynamic entry which typically involves several heavily armed police officers breaching a door in a show of force that is intended to surprise unsuspecting occupants of the premises.  These types of raids are often conducted in the early-morning hours to catch people off-guard, thereby minimizing the risk of destruction of evidence and danger to the life and safety of the police and residents.

The execution of a no-knock warrant is a charged and volatile situation undertaken at the direction and supervision of municipal actors, who plan and execute the warrant and who can reasonably foresee and take steps to avoid many of the risks occasioned by uncertain reactions to chaotic events when the police forcefully cross the threshold of

someone's home. In a no-knock warrant situation, the police exercise extraordinary governmental power to intrude upon the sanctity of the home and take temporary control of the premises and its occupants. In such circumstances, the police direct and control a known and dangerous condition, effectively taking command of the premises and temporarily detaining occupants of the targeted location. As a result, the municipality's duty to the individuals in the targeted premises, a limited class of potential plaintiffs, exceeds the duty the municipality owes to the members of the general public. A special duty therefore arises when the police plan and execute a no-knock search warrant at an identified residence, running to the individuals within the targeted premises at the time the warrant is executed. In other words, in those circumstances, the police take positive control of a known and dangerous condition, creating a special duty under the third situation recognized by this Court.

Accordingly, the certified question should be answered in accordance with this opinion.

WILSON, J. (dissenting):

The Second Circuit certified the following question to this Court:

"Does the 'special duty' requirement—that, to sustain liability in negligence against a municipality, the plaintiff must show that the duty breached is greater than that owed to the public generally—apply to claims of injury inflicted through municipal negligence, or does it apply only when the municipality's negligence lies in its failure to protect the plaintiff from an injury inflicted other than by a municipal employee?" (*Ferreira v City of Binghamton*, 975 F3d 255, 291 [2d Cir. 2020]).

The majority holds that officers who plan and execute a no-knock search warrant owe a "special duty" to the individuals in the targeted premises. My answer is different:

- 1 -

such officers have a duty—not a special duty—to plan and execute the no-knock search warrant in a manner reasonable under the circumstances to avoid foreseeable harm. As the majority recognizes, when New York waived its sovereign immunity (and that of its municipal subdivisions), it "assumed liability for its conduct and consented to have such liability *determined in accordance with the same rules of law applicable to individuals and corporations*" (majority op at 6, quoting *Florence v Goldberg*, 44 NY2d 189, 195 [1978] [emphasis added]; *see also Bernardine v New York*, 294 NY 361, 365 [1945] ["the civil divisions of the State are answerable equally with individuals and private corporations for wrongs of officers and employees"]).

The majority's principal error, which infects its entire analysis, is embodied in the following statement: "Consistent with our precedent and the purpose of the special duty rule, we reiterate that plaintiffs must establish that a municipality owed them a special duty when they assert a negligence claim based on actions taken by a municipality acting in a governmental capacity" (majority op at 2). That statement: (1) is not consistent with our precedent, in which we have repeatedly evaluated negligence claims against governmental actors by asking whether an ordinary duty exists; and (2) improperly incorporates the governmental/proprietary distinction from immunity law into negligence law (*see Motyka v Amsterdam*, 15 NY2d 134, 138 [1965] ["just as it is necessary to sustain an action against an individual or private corporation to ascertain whether it is under a duty to a plaintiff, so, also, it is necessary to decide whether a city or other civil subdivision or municipal corporation is under a duty to a plaintiff irrespective of sovereign immunity"]).

Our numerous precedents—spanning well over a century—establish that municipalities can owe an *ordinary* duty of care to individual members of the public. It is only when a plaintiff cannot demonstrate the existence of an ordinary duty breached by a governmental actor that the "special duty" doctrine comes into play. That is, the "special duty" doctrine is not a contraction of the circumstances under which a plaintiff could establish a claim for negligence; it is, as its name suggests, an expansion that allows a claim of negligence to proceed even when no ordinary duty exists.

Often, recovery in actions where a plaintiff has properly pleaded or proved a claim of negligence against a governmental actor will be blocked by governmental function immunity, but that is not a reason to incorporate immunity-related concepts into the law of negligence: that law is the same whether the actor is private or public.[1]

**I**

Whether the actor is public or private, negligence requires the same elements of proof. To establish a claim of negligence, a plaintiff must prove: (1) a duty owed to the plaintiff by the defendant, (2) a breach of that duty, and (3) an injury that is the proximate result of the breach (*Pasternack v Laboratory Corp. of America Holdings*, 27 NY3d 818, 825 [2016]; *Solomon by Solomon v City of New York*, 66 NY2d 1026, 1027 [1985]; *Akins*

---

[1] The majority acknowledges that "[t]he Second Circuit did not certify a question concerning governmental function immunity and, thus, we have no occasion to address the Second Circuit's analysis of that issue here, despite the City's request that we do so" (majority op at 5 n3). Despite that acknowledgement, the majority discusses governmental immunity at length and then improperly injects that discussion into negligence law as applied to governmental actors (majority op at 7-9). The elements of negligence law and the elements of governmental immunity are two unrelated subjects whose separateness should be maintained, not conflated.

*v Glens Falls City School Dist.*, 53 NY2d 325 [1981]). The first element—whether a defendant owes a duty to a plaintiff—is an important threshold requirement for negligence claims and is the sole element relevant to answering the certified question.

To determine whether a duty exists and the scope of a duty, we consider the wrongfulness of the defendant's action or inaction and examine the plaintiff's reasonable expectations of care owed by others (*Turcotte v Fell*, 68 NY2d 432, 437 [1986]). Risk and foreseeability of an injury help determine whether a duty exists. We have stated that a "risk reasonably to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or others within the range of apprehension" (*Palsgraf v Long Is. R.R. Co.*, 248 NY 339, 344 [1928]). Accordingly, when someone "is by circumstances placed in such a position with regard to another that every one of ordinary sense . . . would at once recognize that if [the second person] did not use ordinary care and skill in his own conduct with regard to the circumstances he would cause danger of injury to the person or property of the other, a duty arises to use ordinary care and skill to avoid such danger" (*Havas v Victory Paper Stock Co.*, 49 NY2d 381, 386 [1980], *quoting Heaven v Prender*, 11 QBD 503, 509, Britt, MR [1883]). Logic, science, and policy factor into our analysis of whether a duty exists (*De Angelis v Lutheran Med. Ctr.*, 58 NY2d 1053, 1055 [1983]).

When someone sues a governmental entity for negligence, the first inquiry is whether the governmental entity owes an ordinary duty of care to the plaintiff. As with any negligence claim, that ordinary duty depends on a plaintiff's reasonable expectations and the foreseeability of injury to the plaintiff based on the defendant's actions (*see Turcotte*, 68 NY2d at 437; *Palsgraf*, 248 NY at 344; *Havas*, 49 NY2d at 386). We have thus found

an ordinary duty of care was owed to an individual by a governmental defendant in numerous and varied situations—for example where a city employee improperly screened by a city agency sexually assaulted a person (*Haddock v City of New York*, 75 NY2d 478 [1990]); where governmental entities failed to maintain a highway safely (*Brown v State of N.Y.*, 31 NY3d 514 [2018]; *Turner v Newburgh*, 109 NY 301 [1888]); where a police officer shot and paralyzed a person who was unarmed and running away from a robbery (*McCummings v NYC Transit Auth.*, 81 NY2d 923 [1993]); where an iron grate at a courthouse crushed a coal deliveryperson (*Galvin v. Mayor of New York*, 112 NY 223 [1888]); where police allegedly shot and killed someone who was intoxicated and not posing any harm to the officers (*Flamer v City of Yonkers*, 309 NY 114 [1955]); where a Board of Education negligently supervised a student who attacked another student (*Mirand v City of New York*, 84 NY2d 44 [1994]); where a runaway police horse injured a bystander (*Bernardine*, 294 NY 361); where the state permitted an opening in the railing of a bridge, through which a child fell and a father died attempting a rescue (*Gibney v State*, 137 NY 1 [1893]); where police shot and killed an innocent bystander being held up by someone in a store (*Meistinsky v City of New York*, 309 NY 998 [1956]); and "frequently" where state entities "breach[ed] [their] duty to protect others from the acts of the mentally ill confined to State institutions" (*Williams v State*, 308 NY 548, 549 [1955] [collecting cases]). In those myriad instances, we held that governmental entities, sometimes through police action, bore an ordinary duty of care. In none of those cases did we suggest any "special duty" was involved, and in many the facts would not have fit within any of the avenues available to recognize a special duty.

If a plaintiff cannot prove an ordinary duty of care owed by a governmental defendant, a plaintiff may nevertheless be able to maintain a negligence claim by showing that the governmental defendant bore a "special duty" running to that plaintiff. Governmental entities may assume a "special duty" to a plaintiff by three avenues: first, where a plaintiff belongs to a distinct class for whose benefit a statute was enacted; second, where a governmental actor voluntarily assumes a duty to the plaintiff beyond what is owed to the public generally;[2] and third, where a governmental actor takes positive control of a known and dangerous safety condition (*Applewhite v Accuhealth*, 21 NY3d 420, 426 [2013]). Proving a "special duty" is not a requirement for all suits against a governmental entity; instead, it is a means for some individuals to maintain negligence claims when they are unable to prove an ordinary duty of care owed by the governmental defendant. The "special duty" doctrine expands the circumstances in which governmental entities can be held liable in negligence even when the government owes no ordinary duty of care to the plaintiff. The "special duty" is not, as the majority suggests, a restrictive requirement that applies to all negligence suits against governmental entities acting in a governmental capacity. Instead, it arises where the governmental actor has, through its actions as to a specific, identifiable individual, undertaken a duty it would not otherwise have (or, in a

---

[2] A plaintiff must satisfy each of four conditions to prove a governmental defendant voluntarily assumed a special duty to the plaintiff: (i) the governmental defendant must have assumed through promises or actions an affirmative duty to act on behalf of the injured party; (ii) the governmental defendant must have known that its inaction could cause harm; (iii) the plaintiff must have had direct contact with the governmental defendant; and (iv) the plaintiff must have justifiably relied on the governmental defendant's affirmative undertaking (*Cuffy v City of New York*, 69 NY2d 255, 260 [1987]).

circumstance not relevant here, the legislature has statutorily created a duty for a defined class of persons). Thus, the doctrine is akin to the "ancient" common-law rule (subsequently modified by good Samaritan laws) that "one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully" (*Glanzer* v *Shepard*, 233 NY 236, 239 [1922]; *see also Marks v Nambil Realty Co.*, 245 NY 256 [1927]).

We have typically considered the "special duty" doctrine where a municipality has failed to protect the plaintiff from harm caused by a third party. The "special duty" inquiry can arise in such situations because a general duty municipalities may have to protect the public does not automatically give rise to an ordinary duty owed to a specific individual. In several early cases, we concluded that the general obligation of a municipality to provide water to residents does not create a duty sufficient to render municipalities liable in negligence to owners of buildings that burned because of a failure in the water supply (*see, e.g.*, *Steitz v Beacon*, 295 NY 51 [1945]; *H. R. Moch Co. v Rensselaer Water Co.*, 247 NY 160 [1928]). Likewise, the fact that local governments are responsible for police and fire services does not create a duty sufficient to support claims of negligence for the failure of those services to prevent or minimize harm to individual members of the public caused by a third party. The government is not meant to serve as an insurer against harm individuals may suffer on part of third parties, a proposition particularly relevant to the context of policing (*Valdez v City of New York*, 18 NY3d 69, 75 [2011]). As we summarized in *Riss v New York* (22 NY2d 579, 583 [1968]), "there is no warrant . . . for the courts, in the absence of legislation, to carve out an area of tort liability for police protection to members

of the public. Quite distinguishable, of course, is the situation where the police authorities undertake responsibilities to particular members of the public and expose them, without adequate protection, to the risks which then materialize into actual losses (*Schuster v City of New York*, 5 NY2d 75)". In a nutshell, then, the special duty doctrine typically pertains, as the Second Circuit was "inclined to think" (975 F3d at 282), to acts by third parties where the plaintiff alleged that the government failed to protect the plaintiff.

In situations like those above, where the provision of government services is insufficient to support an ordinary duty necessary for a negligence claim to proceed, we then have asked whether a special duty exists. Thus, we considered whether a special duty arose where the police promised to staff a school crosswalk and the child's parent relied on that promise (*Florence v Goldberg*, 44 NY2d 189, 195 [1978]); where the police assured a woman that they would arrest her estranged boyfriend "immediately" (*Valdez v City of New York*, 18 NY3d 69, 72-73 [2011]); and where parents placed their child at a family daycare center in reliance upon assurances from the city that the center was safe (*McLean v City of New York*, 12 NY3d 194, 197-202 [2009]). If municipalities had an ordinary duty—sufficient to support a claim of negligence—to staff all school crosswalks, or arrest all threatening boyfriends immediately, or refuse to license daycare facilities with substantiated claims of abuse against them, no examination of any special duty would have been required. Instead, because no ordinary duty sufficient to support a claim of negligence could be imputed to those municipalities, only then did we ask whether the plaintiffs' negligence claims could nevertheless survive under any special duties assumed by or statutorily applicable to the municipalities.

**II**

Because we have rendered numerous decisions in which governmental entities were held liable under an ordinary standard of duty for injuries directly caused by their own employees or agents, the majority cannot bypass whether Binghamton owes an ordinary duty of care when planning and executing no-knock warrants. The oddest part of the majority's opinion is that it firmly establishes the existence of an *ordinary* duty of municipalities to use reasonable care in planning and executing no-knock warrants. Turning to the three avenues under which a special duty might exist, the first (statutory duty) and second (promise to the plaintiff) are not relevant here; the majority rests on the third (taking "positive control of a known and dangerous safety condition"). But everything the majority recites as to the inherent danger of no-knock search warrants more than suffices to establish an ordinary duty of care under settled negligence doctrine. The majority's conclusions are not facts based on the particulars of the no-knock warrant here; instead, they are universally applicable to no-knock warrants (*see* majority op at 19). Thus, where the special duty doctrine looks to the facts specific to the plaintiff and defendant, here, the majority, though terming what it establishes as a "special duty," in truth has established an ordinary duty of the police to take reasonable care in planning and executing no-knock warrants.

The majority's description of the duty as running "to the individuals in the targeted premises" would be *dicta* if meant to exclude others within the foreseeable zone of danger from the police activity. Here, the plaintiff was present inside the targeted premises, so the question as to persons outside the premises but within the zone of danger is not presented.

However, depending on the means used in other no-knock warrant executions, persons other than occupants of the premises may be among those to whom an ordinary duty runs (e.g., residents of a neighboring apartment if bullets travel through walls or if tear gas or concussion grenades start a fire). As we have noted, one of the factors important in determining the existence and scope of duty is "whether the plaintiff was within the zone of foreseeable harm" (*Di Ponzio v Riordan*, 89 NY2d 578, 583 [1997]).

At least as applied to no-knock warrants, the difference between my view and that of the majority may only be one of semantics: whether one calls the duty "ordinary" or "special," it indisputably exists in such situations and can form the basis for a negligence action against the police, provided the remaining elements of a negligence claim are proven. The difficulty from the majority's articulation comes not in the likely result in this case, but in future cases in which the majority's decision may be interpreted to bar any negligence claims against a governmental actor unless a "special duty" is proved. One of two things will likely happen: either legitimate claims of negligence will be barred by the majority's misinterpretation of "special duty" here, or "special duty" will no longer turn on individual facts, but will be applied categorically, as the majority does here. As an example of the latter, many, but not all, of the factors identified by the majority for the creation of a "special duty" pertaining to no-knock warrants apply equally to ordinary warrants for search of a home: multiple, heavily armed officers arrive unannounced; they often execute warrants early in the morning; they take control of the premises and the situation; and the potential for confrontation is high. It is not much of a step at all to conclude that the police, in executing an ordinary search warrant of a home, have a duty to the occupants (and those

within the zone of danger), though the steps reasonably necessary to discharge such a duty may be less than in the case of a no-knock warrant. If all such duties are termed "special" merely because a municipality is the defendant, we will have abandoned the proper meaning of a "special duty," but perhaps will have done no harm.

**III**

The majority incorrectly interprets the absence of any discussion on special duty in several cases where this Court allowed negligence claims to proceed against municipalities. The majority claims that the silence in those cases leaves the door open to hold that no claim of negligence against a governmental actor lies unless the plaintiff establishes a special duty, because "we have never affirmatively held that a plaintiff need not establish a special duty when stating a negligence cause of action against a municipality for acts occurring when the municipality was engaged in a governmental function" (majority op at 17). There are two problems with that conclusion. First, whether the municipality was "engaged in a governmental function" has nothing to do with the law of negligence. As discussed previously, we have repeatedly held that the law of negligence is the same for public and private actors. Whether the defendant was "engaged in a governmental function"—as compared to a proprietary one—is not a negligence question, it is an immunity question. Without doubt, governmental actors acting in a governmental

(nonproprietary) capacity have an immunity that private actors do not have. That immunity may bar a valid negligence claim. It does not alter the elements of the negligence claim.[3]

Second, the majority has things backwards. Our numerous cases sustaining negligence claims against governmental defendants without any mention of a special duty establish that no such duty is needed when an ordinary duty exists. The plaintiffs in those cases did not need to allege any special duty; they had viable claims of negligence because the municipality owed them an *ordinary* duty of care.

As an example, our decision in *McCrink v New York* (296 NY 99 [1947]) holds that an ordinary duty can suffice to render a municipality liable in negligence even when a governmental function is involved, without any need to prove a special duty. There, an unprovoked shooting by a drunken, off-duty New York City police officer left McCrink dead and Murphy permanently injured. We explained:

> "The breach of duty by the city which the plaintiffs pleaded and the theory upon which the case was tried was that the city negligently failed to discharge Anderson when it knew, or in the exercise of reasonable care should have known, that he was an incompetent, troublesome and vicious person who had become so addicted to an excessive use of alcohol that he had repeatedly been the subject of disciplinary action; and that, with knowledge of Anderson's vicious propensities the city knew or should have known that his compliance with rule 288 of the Rules and Regulations of the Police Department - which required him as a patrolman to carry a revolver 'at all times' - was a source of danger to the public" (*id.* at 104).

---

[3] The majority claims that "[o]ur cases plainly demonstrate the significance of the proprietary/governmental function distinction to the special duty analysis, with only proprietary functions subject to an 'ordinary' duty of care" (majority op at 9 n4, citing *Wittorf v City of New York*, 23 NY3d 473, 479-80 [2014]; *Schrempf v State of New York*, 66 NY2d 289, 294 [1985]). That claim is erroneous; those cases merely demonstrate that when governmental actors act in proprietary functions, they are held to ordinary duties of care. Those cases do not hold—nor do any other cases—that *only* when a government actor acts in a proprietary function may it be subject to an ordinary duty of care.

None of the three avenues to establish a special duty could have been present in that case: no statute specially protected McCrink or Murphy; no promise was made to and relied on by them; and the police did not take control of a dangerous situation. Instead, the claim was based on an ordinary duty, running to individual members of the public, as to which we emphasized that the "civil divisions of the State . . . are answerable equally with individuals and private corporations for wrongs of officers and employees" (*id.* at 106, quoting *Bernadine*, 297 NY at 365). Thus, we held that even though the Police Commissioner's authority "to dismiss a member of the police force, calls for the exercise of his discretion," where "the retention of an employee may involve a known risk of bodily harm to others . . . that discretion . . . is limited. It is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived" (*id.* at 105-06, citing *Palsgraf*, 248 NY at 344). Thus, it is painfully clear that no special duty is needed to hold a governmental defendant liable for even discretionary governmental actions. Again, immunity, which bars many such suits, is an independent consideration wholly distinct from whether an ordinary duty suffices to support a claim of negligence against a governmental entity.

An instructive counterpoint is *Williams v State* (308 NY 548 [1955]), in which we held that the State had no duty running to the decedent, who was frightened to death when an incarcerated individual with no history of violence escaped from a minimum-security prison farm and induced the decedent to drive him to Syracuse. Although the operation of prisons is a quintessential governmental function, our decision does not import immunity or "special duty" into its analysis. Instead, relying on our foundational negligence decisions

in *Palsgraf* and *O'Neill v City of Port Jervis* (253 NY 423 [1930]), we rested our analysis

on the proposition that it is the "'risk reasonably to be perceived', which defines the *duty*

'to be obeyed' in each situation" (308 NY at 554, quoting *Palsgraf*, 248 NY at 344).

Applying that ordinary rule for the determination of duty, we carefully distinguished

between "the risks to be perceived with the mentally ill who are irresponsible", which

"define[ ] the State's duty to protect others from them," and the risks to be perceived with

the incarcerated individual who escaped the prison farm, who "was not a psychiatric

patient" and who "had been imprisoned for a *toy* pistol holdup, and had a relatively tranquil

record while in prison" (*id.* at 555 [emphasis in original]). That comparison led to our

conclusion that there was no "basis for the foreseeability of [the individual's] conduct"

toward the decedent (*id.* at 555). We further explained that:

> "[u]nlike a mental patient, [the incarcerated individual] was being *punished* . .
> .[t]hus, if the State negligently permitted [his] premature return to society, it
> breached only that *public* duty to *punish*, a duty owed to the members of the
> community collectively but importing no 'crushing burden' of liability to
> individuals for the breach thereof. If it was a wrong, it was not a wrong to [the
> decedent], for, as to him, the breach of duty or wrong did not carry with it
> 'possibilities of danger'; the assault or threatened force upon him was not 'The risk
> reasonably to be perceived' (*id.* at 556 [internal citations omitted]).

Like *McCrink*, *Williams* illustrates the analysis relevant here: even though the defendant is

a governmental entity acting in a governmental (nonproprietary) capacity, special duty and

governmental function do not enter the determination of the existence and scope of duty in

negligence. Ordinary principles of negligence law, fashioned by the court, determine the

existence and scope of duty. That includes a consideration of public policy; in *Williams*,

the concern that the expansion of duty "would impose a heavy responsibility upon the State,

or dissuade the wardens and principal keepers of our prison system from continued experimentation with 'minimum security' work details" (*id.* at 557), and the observation that statutory and disciplinary procedures were sufficient to ensure appropriate care in preventing prison escapes (*id.* at 558).

The same proposition applies to cases the majority cites for their silence on special duty (*Flamer*, 309 NY at 119; *Wilkes v City of New York*, 308 NY 726, 728 [1954]; *Meistinsky*, 309 NY at 1000; *Haddock*, 75 NY2d) (majority op at 16). There was no basis to consider a special duty in those cases because an ordinary duty of care was established.[4] The majority appears to wish that those cases included a statement in *dicta* stating something to the effect of, "The plaintiff in these circumstances does not need to establish that the municipality owed a special duty." But courts are not in the habit of itemizing unnecessary, more difficult claims that a successful plaintiff might have tried to plead. When a tourist asks me for directions to a subway stop, I point out the shortest route. I have never added, "there is a much longer, more circuitous route you could take instead of walking one block south."

---

[4] The majority acknowledges the challenge that cases like *McCummings*, *Meistinsky*, *Flamer*, and *Wilkes* pose to its decision when it states that its "decision does not implicitly overrule [those cases]" and that "[w]e simply have not yet examined factual circumstances similar to those cases through the lens of our contemporary understanding of the special duty doctrine" (majority op at 16 n7). The majority draws the wrong conclusion; those cases' silence on special duty emphatically illustrates that the special duty doctrine is wholly irrelevant to their disposition. The governmental defendants in those cases did not mention any "special duty" limitation—or any other legally inapplicable concept—precisely because of the legal irrelevance.

Indeed, the majority's own characterization of the special duty doctrine exposes its error. The majority states that "[t]he special duty doctrine thus developed 'to rationally limit the class of citizens to whom the municipality owes a duty *of protection*'" (majority op at 9, citing *Kircher v City of Jamestown*, 74 NY2d 251, 258 [1989] [emphasis added]). The cases cited by the majority for its descriptions of the special duty doctrine all are cases that involve claims that governmental actors failed in their duty to protect an individual from third-party harm (majority op at 7, 9-11) (*Connolly v Long Is. Power Auth.*, 30 NY3d 719, 725-26 [2018] [failure of municipal utility companies to prevent harm caused by Hurricane Sandy]; *Applewhite*, 21 NY3d at 426 [failure of EMTs to address harm caused by a nongovernmental nurse]; *Tara N.P. v Western Suffolk Bd. of Coop. Educ. Servs.*, 28 NY3d 709, 714 [2017] [county's failure to protect person from sexual assault by worker at a county facility]; *Kircher*, 74 NY2d at 258 [failure of city and police to respond to reports of abduction and protect person from subsequent beating and sexual assault]; *Cuffy*, 69 NY2d at 260 [failure of city to protect landlord and family members from injuries imposed by tenants]; *Sorichetti v City of New York*, 65 NY2d 461, 468 [1985] [police failure to respond to mother's request for assistance resulting in a failure to protect minor child from injuries inflicted by father]). When a governmental actor directly and negligently injures someone, no "duty of protection" is involved—it is a duty not to inflict injury.

Likewise, the majority's observation that the special duty doctrine "minimizes a municipality's exposure to 'open-ended liability of enormous proportions with no clear outer limits,' which could otherwise 'discourage municipalities from undertaking activities to promote the general welfare' that may expose them to liability" undermines its

interpretation of that doctrine (majority op at 18, citing *O'Connor v City of New York*, 58 NY2d 184, 191 [1983]; *McLean v City of New York*, 12 NY3d 194, 204 [2009]). Open-ended-liability of enormous proportions could well result if the government could be held liable for negligently failing to protect people from the acts of third parties, which is precisely where the special duty doctrine lives. In contrast, holding the government liable in negligence for its own acts that directly cause injury serves the same socially beneficial purpose as with private actors: placing an economic incentive to take reasonable steps to avoid unnecessary harm on the party able to avoid it. To the extent a different cost-benefit calculus pertains to some types of government action that cause direct injury, that is handled through the separate application of governmental immunity, not contortions of negligence law.

The two cases on which the majority relies most heavily, *Applewhite* (21 NY3d) and *Lauer v City of New York* (95 NY2d 95 [2000]), do not support its novel proposition that governmental actors acting in a governmental capacity cannot be sued for negligence unless a special duty is established. In *Applewhite*, a private visiting nurse injured a child by administering medicine that produced anaphylaxis. Government-affiliated EMTs who responded to the emergency lacked epinephrine, and, while performing CPR, advised the mother to wait for the properly equipped EMT vehicle to arrive instead of taking the child to the hospital. The child ultimately suffered brain damage. We remanded *Applewhite* to the trial court for a determination of whether the EMTs assumed a special duty to the child. *Applewhite* is entirely consistent with a proper understanding of negligence law and offers the majority no support. Just as police and firefighters have no duty, actionable through a

claim of negligence, to protect the public from criminals and fires, EMT's have no such duty to protect the public from injuries caused by private nurses (or otherwise). If the EMTs themselves negligently administered a lethal drug to the child, or (as in *McCrink*) the municipality knew that the ambulance driver was prone to drive drunk, and while doing so he crashed the ambulance on the way to the hospital, no special duty would be required: the question then would only be whether the law imposed an ordinary duty of care.

The majority also misreads *Lauer*. A careful reading shows that it, too, does not support the majority's claim. In *Lauer*, a doctor employed by the New York City Chief Medical Examiner ruled a child's death a homicide from blunt trauma to the head (95 NY2d at 97-98). Several weeks later, the doctor realized that the cause of death was a brain aneurism, but the doctor failed to correct the autopsy report or inform the police. The police continued investigating the father for 17 months, during which he allegedly was ostracized by his neighbors, divorced by his wife, and was subjected to other humiliation and harassment (*id.*).

In *Lauer*, we discussed conditions that could give rise to a special duty owed to the father from the Office of the Chief Medical Examiner, but our central holding in the case was that there was no duty—ordinary or special—that was owed to the father. In the decision, we explained that our focus was on duty—"an essential element of any negligence case"—because "[w]ithout a duty running directly to the injured person there can be no liability in damages, however careless the conduct or foreseeable the harm" (*id.* at 100). We discussed that "[t]o sustain liability against a municipality, the duty breached must be more than that owed the public generally" (*id.*)—capturing the oft-stated

proposition that merely because a city has a generalized duty to provide police or fire protection or water, that sort of obligation does not establish an ordinary duty to a given individual under negligence law. (Likewise, when party A contracts with party B, no tort for negligent performance of the contract will lie, even though there is a contractual "duty" to perform the contract obligations [*Clark-Fitzpatrick, Inc. v Long Island R. Co.*, 70 NY2d 382, 389 (1987)]). Because the plaintiff in *Lauer* could not "point to a duty owed to him by the Office of the Chief Medical Examiner, his negligence claim must fail" (*id.* at 101). We then explained why no duty existed. First, we rejected Lauer's argument that New York City Charter § 557 created a duty that ran to "members of the general public who may become criminal suspects" (95 NY2d at 102). Next, we rejected Lauer's contention that there was a "special relationship" between Lauer and the Medical Examiner because none of the four elements necessary to create a special relationship were met (*id.*, citing *Cuffy v City of New York*, 69 NY2d 255, 260 [1987]).

After rejecting those arguments, we then turned more broadly to the question of duty—not special duty, but duty generally. We began by noting that "absent legislative intervention, the fixing of the 'orbit' of duty, as here, in the end is the responsibility of the courts" (*id.* at 103, quoting *De Angelis v Lutheran Med. Ctr.* [58 NY2d at 1055]). We then considered whether "to impose a new duty on the Office of the Chief Medical Examiner, which for the future would run to members of the public who may become subjects of a criminal investigation into a death." In determining not to do so, we did not discuss "special duty" whatsoever—because the duty would have been an ordinary duty—one that did not implicate any of the three avenues for establishment of a special duty (statutory duty for a

specific class; promise and reliance; assumption of control over a dangerous situation). Instead, we declined to establish a general duty because, after weighing the "consequential effects" of such a duty, we could not "agree that the proposed enlargement of the orbit of duty, resting largely on the foreseeability of harm, is a sound one."

Thus, far from supporting the proposition that any negligence claim against a governmental actor exercising a governmental function must rest on a special duty, *Lauer* illustrates that, even when the elements necessary to create a special duty are lacking, the court may nevertheless establish an ordinary duty applicable to governmental actors exercising a governmental function. We considered doing so and rejected it in that case, noting that "fixing the orbit of duty has likely divided this Court more than any other issue" (*id.* at 103). Strangely, although announcing a novel proposition that the existence of a "special duty" is a *sine qua non* of governmental liability when the government exercises a governmental (non-proprietary) function, the majority has, under the misnamed moniker of "special duty," conducted the balancing of policy concerns pertinent to establishing a general duty and has done exactly that: where we refused to create a duty running from the Medical Examiner to homicide suspects in *Lauer*, here, we have announced a duty running from the police to (at least) persons present within the premises subject to no-knock warrants.

## IV

The disagreement between the majority and me may seem semantic, but the difference in analytic method and faithfulness to our precedent is important. We must acknowledge, as so many of our cases hold, that our government can owe ordinary duties

of care to those within our borders. Cabining governmental negligence to situations where the Legislature has expressly protected a certain class of person, promises made to and relied on by a specific individual, and circumstances where the government takes control of a dangerous situation, flouts our precedent such as *McCrink* and *Meistinsky,* which establish an ordinary duty of municipalities—running to affected members of the public and requiring proper hiring and training of police officers—sufficient to support a claim of negligence if breached. It also evidences either a tone deafness to the needs of modern society or a fundamental misunderstanding of the nature of tort law, or both. Just as "[p]recedents drawn from the days of travel by stage coach do not fit the conditions of travel today," the scope of duty attendant to police activity differs today than it did in the days of the stage coach. The scope of ordinary duty in negligence is ours to define, and must embody "whatever the needs of life in a developing civilization require them to be" (*MacPherson v Buick Motor Co.*, 217 NY 382, 391 [1916]).

Where we could have revived the proud tradition of Chief Judge Cardozo's court in advancing tort law to meet modern needs by announcing an ordinary duty of the police to use due care in planning and executing no-knock warrants, the majority has littered its opinion with unsound conclusions suggesting that police activity—or any nonproprietary governmental negligence—can proceed only by establishing a special duty. Instead of advancing the law, we become a regressive outlier. Other states do not require any showing

of a special duty when a governmental actor has directly harmed the plaintiff.[5] Query how

the majority's formulation will address a situation in which a police officer pursues a

---

[5] Some states articulate a "public duty doctrine" that provides that a plaintiff suing a governmental unit or agent must establish that the government owed that plaintiff a duty of care separate from its general duties to the public at large. Where the duty a plaintiff alleges was violated is a general duty to the public, the plaintiff may nevertheless sue in negligence if the plaintiff can show a special relationship was assumed by the municipality. The public duty doctrine, however, is irrelevant where a government actor directly harmed a plaintiff in a way that would give rise to a tort action were the harm committed by a private actor (*see Kent v City of Columbia Falls*, 379 Mont 190, 201 [2015] ["(C)ourts should first determine whether a governmental defendant has a specific duty to a plaintiff arising from 'generally applicable principles of law' that would support a tort claim. If a private person would be liable to the plaintiff for the acts that were committed by the government, then the governmental entity would similarly be liable. Where such a specific duty and breach exists, the public duty doctrine has no application"]; *Cope v Utah Valley State Coll.*, 342 P3d 243, 252 [Ut 2014] ["(I)f a police officer affirmatively acts by negligently discharging his weapon and wounds a child ten blocks away, it would be absurd to inquire whether the officer had a special relationship with the innocent victim. Imposing liability if the officer happened to have a special relationship with the child, but disallowing recovery if no such relationship existed simply would not make sense"]; *Coty v Washoe Cty.*, 108 Nev 757, 760 [1992] [along with instances where a police or fire department assume a special duty to the plaintiff, instances where "a public officer's conduct '*affirmatively causes' harm* to an individual" is an exception to the public duty doctrine] [emphasis in original]; *Mancini v City of Tacoma*, 196 Wash2d 864, 885-86 [2021] ["Unlike government actors in many public duty doctrine cases who fail to protect a plaintiff from harm caused by a third party or entity, the police in this case personally caused the harm of which (plaintiff) complains. In such cases of affirmative misfeasance, all individuals have a duty to exercise reasonable care—including when they invade another's property"] [internal citations omitted]; *see also Stevenson v City of Doraville*, 294 GA 220, 220-23 [2013] [stating that the public duty doctrine does not apply to claims of misfeasance, which are claims of active negligence]; *Williams v State of California*, 34 Cal3d 18, 24 [1983] [holding that common law on whether people have a duty to respond to accidents applies to police officers and quoting a D.C. appellate court for the claim that, "A person does not, by becoming a police officer, insulate himself from any of the basic duties which everyone owes to other people, but neither does he assume any greater obligation to others

suspect into a crowd and opens fire wildly, injuring bystanders, or engages in a high-speed chase through a pedestrian-laden area, striking several pedestrians. None of our avenues for creation of a special duty would apply, though a future court should find itself hard-pressed to say that because the officer was engaged in a governmental function, the officer (and, vicariously, the government) cannot be held liable in negligence. What we should want that future court to hold is that, just as a private security guard has a duty not to fire into a crowd of bystanders or drive recklessly through a pedestrian mall, government employees have that same duty. In what circumstances we might grant immunity to the officer or governmental entity is a wholly separate question, one not raised here and one which should not be incorporated into the determination of negligence.

Following certification of a question by the United States Court of Appeals for the Second Circuit and acceptance of the question by this Court pursuant to section 500.27 of this Court's Rules of Practice, and after hearing argument by counsel for the parties and consideration of the briefs and record submitted, certified question answered in accordance with the opinion herein. Opinion by Judge Singas. Chief Judge DiFiore and Judges Garcia, Cannataro and Troutman concur. Judge Wilson dissents in an opinion, in which Judge Rivera concurs.

Decided March 22, 2022

---

individually. The only additional duty undertaken by accepting employment as a police officer is the duty owed to the public at large"]). Other states do not have a special duty or public duty rule at all (*see Natrona County v Blake*, 81 P3d 948 [Wy 2003]; *Schear v Board of County Com'rs of Bernalillo Cty*, 687 P2d 728 [NM 1984]; *Brennen v City of Eugene*, 285 Or 401, 411 [1979]; *Coffey v City of Milwaukee*, 74 Wis 2d 526 [1976]; *Coleman v East Joliet Fire Prot. Dist.*, 46 NE3d 741, 757-58 [Ill 2016]).